**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

*In Re Motion to Quash Deposition Subpoena to*
*Lance Wagar*

CORPORATE EXPRESS OFFICE PRODUCTS, INC.,
                              Plaintiff,

                  - v -                                         Civ. No. 1:06-MC-127
                                                                           (LEK/RFT)

JAMES C. GAMACHE, BRIAN OLAS, and
W.B. MASON COMPANY, INC.,
                              Defendants.

**APPEARANCES:**                                    **OF COUNSEL:**

REED SMITH LLP                                      PAUL ROONEY, ESQ.
Attorney for Lance Wagar
599 Lexington Avenue, 29th Floor
New York, New York 10022

NIXON PEABODY LLP                                   GREGG A. RUBENSTEIN, ESQ.
Attorneys for Defendants Gamache,
Olas, and W.B. Mason Company, Inc.
100 Summer Street
Boston, Massachusetts 02110

NIXON PEABODY LLP                                   ANDREW C. ROSE, ESQ.
Attorney for Defendants Gamache,
Olas and W.B. Mason Company, Inc.
30 South Pearl Street
Albany, New York 12207

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### MEMORANDUM-DECISION and ORDER

A Subpoena, dated September 22, 2006, was served upon Lance Wagar compelling him to

attend a deposition, which was scheduled for October 3, 2006, and to produce documents. Dkt. No.

7, Mem. of Law at ¶ 11; Dkt. No. 1, Mot. to Quash, Ex. C. Subpoena. Wagar did not comply with

the dictates of the subpoena and, instead, filed a Motion to Quash the Subpoena.  Dkt. No. 1, Mot. to Quash, with Exs. (A-D) & Prelim. Statement.  In response to this Motion, Defendants Gamache, Olas and W.B. Mason Company, Inc. (hereinafter W.B. Mason),[1] filed a Cross-Motion compelling Wagar, a non-party deponent in a case pending before the United States District Court for the District of Maine, to be deposed and produce documents.  Dkt. No. 7, Cross-Mot., dated Nov. 10, 2006, with  Four Attorney Decls., & Ex. A.  On or about November 20, 2006, Wagar filed an Opposing Brief to the Cross-Motion to Compel, along with another Declaration.  Dkt. No. 8, Brief & Lance Wagar's Decl., dated Nov. 20, 2006.   Shortly thereafter, on November 22, 2006, Defendants filed a Reply Brief with more exhibits.  Dkt. No. 9, Defs.' Reply Mem. of Law.  Based upon the discussion to follow, Wagar's Motion to Quash is **denied** and Defendants' Motion to Compel is **granted in part** and **denied in part**.

## I.  BACKGROUND

A.  The Maine and New Jersey Litigations

The genesis of our discovery matter begins with an on-going, long standing legal disagreement between Corporate Express Office Products, Inc., (hereinafter CEOP) and W.B. Mason, who are direct and hostile competitors; this disagreement has visited several courts.[2]  The overarching complaint by CEOP against W.B. Mason is that it is, and has been, interfering with

---

[1]  Hereinafter, James C. Gamache, Brian Olas and W.B. Mason Company, Inc., shall be referred to collectively as Defendants.

[2]  It appears that there are at least three pending cases, which are related in facts and substance: *Corporate Express Office Products, Inc., v. Julianello, et. al*, Civil Action No. 05-1546, Mass. Sup. Ct., Plymouth County; *W.B. Mason et. al., Corporate Express Office Product, Inc. v. Arguedas and Wagar*, Dkt. No. C-08-06, New Jersey Sup. Ct.; and *Corporate Express Office Products, Inc., v. Gamache et. al*, Civ. No. 06-106-P-H, D. Maine. Dkt. No. 7, Mem. of Law at ¶¶ 1, 8 & 15; Dkt. No. 1, Wagar Decl., at ¶¶ 1& 2.  In addition to these cases, apparently there were two other cases brought in Connecticut. *See* Dkt. No. 1, Ex. B,  Defs.' Answer with Counterclaims, at Counterclaims ¶¶ 15 & 16.

CEOP's business by raiding their employees, employing other dilatory practices, and convincing CEOP's employees that have joined W.B. Mason to ignore the employee's non-competition, non-solicitation and confidentiality agreements with CEOP. Dkt. No. 1, Ex. A, Maine Compl., dated June 12, 2006, at ¶¶ 1-3. By inducing CEOP's sales workforce to defect to W.B. Mason, CEOP alleges that W.B. Mason's motivation for such inducement is to acquire CEOP's proprietary contacts. *Id*. at ¶ 4. For example, in November 2005, eighteen CEOP employees defected from CEOP and joined the ranks of W.B. Mason. *Id*. at ¶ 7. One of those eighteen employees was Lance Wagar, the subject of our Subpoena. *Id*. As employees of W.B. Mason, CEOP claims that W.B. Mason "tacitly, if not expressly, expected and encouraged [former CEOP employees] to violate their restrictive covenants by sharing [] confidential proprietary information and soliciting [CEOP] customers in order to justify their guaranteed salaries and thereby enrich Mason." *Id*. at ¶ 12.

Apparently the New Jersey case was commenced first, but both the Maine and New Jersey Litigations arise generally out of the same legal contentions. *See supra* n. 2; Dkt. No. 7, Stephen W. Rider, Esq., Aff., dated Nov. 10, 2006, at ¶ 5. Ostensibly Wagar, when initially employed by CEOP, signed a non-compete, confidentiality agreement before briefly joining W.B. Mason. Dkt. No. 1, Wagar Decl., at ¶ 2. At some juncture prior to this Motion, Wagar re-united with CEOP and is currently employed by them. *Id*. at ¶¶ 2, 3 & 5. "Earlier this year [2006]," the New Jersey Litigation was commenced by W.B. Mason challenging the validity of CEOP's non-compete agreements with its former employees, and likewise involved claims by CEOP of tortious interference with a contract by W.B. Mason and breaches of Wagar's and five other former employees' non-compete, confidentiality agreements with CEOP. *Id*. at ¶ 2; Wagar's Prelim. Statement. at p. 4; Dkt. No. 7, Mem. of Law, at ¶¶ 15 & 16. In the New Jersey case, from March

14, 2006 to July 28, 2006, Attorney Stephen W. Rider and the law firm of McCarter & English represented Wagar while Nixon Peabody represented W.B. Mason.  Wagar's Prelim. Statement at p. 4; Dkt. No. 7, Mem. of Law at ¶ 17, Rider's Aff., at ¶ 5.

Wagar asseverates that he shared many confidences with Attorney Rider about the subject matter of the New Jersey Litigation and knew that Attorney Rider worked closely with W.B. Mason's attorneys, Nixon Peabody, in defending the lawsuit.  Dkt. No. 1, Wagar's Decl., at ¶ 3. Seemingly, Wagar and W.B. Mason may have had a joint defense agreement of strategy.  *Id*; Dkt. No. 7, Mem. of Law at p. 9.   He also avers that in light of this united defense strategy, Wagar conferred with Gregg Rubenstein and met Deborah L. Thaxter, both of counsel to Nixon and Peabody.  Wagar Decl. at ¶¶ 3 and 4.  In order to address a motion to dismiss, it appears that Attorney Rubenstein prepared Wagar's certifications,[3] and it is Wagar's recollection that he conversed with Rubenstein on at least ten occasions, discussing the motion and the issues of the case.  *Id*. at ¶ 3.  Wagar suffers under the belief that Rubenstein, in addition to Stephen Rider, was one of his lawyers.  *Id*.  Evidently, Wagar and the other Defendants in the New Jersey Litigation attended a meeting, possibly a legal strategy conference, in which Attorney Thaxter led segments of the discussion.  *Id*. at ¶ 4.  Later in the meeting she introduced herself to Wagar and left him with the impression that she and Nixon Peabody were working very closely with his attorney, Rider.  *Id*.

All of the above factual contentions made by Wagar are fervently disputed by Nixon Peabody's counsel and Rider.  *See* Dkt. No. 7, Aff. of Rider, Decls. of Rubenstein, & Deborah L. Thaxter, Esq., dated Nov. 10, 2006.

---

[3]  This Court remains uncertain as to what is the exact nature of the certifications prepared by Attorney Rubenstein on Wagar's behalf, except Rubenstein succinctly states that they were responses "to certain statements made by [CEOP's] employees and further clarified the extent of Mr. Wagar's contacts with New Jersey."  Dkt. No. 7, Gregg A. Rubenstein, Esq., Decl., dated Nov. 10, 2006, at ¶ 2.

After Wagar reunited with CEOP, CEOP's claims against him were dismissed, Attorney Rider was discharged as Wagar's counsel, and Wagar began to confer extensively with CEOP's attorney on various legal actions between W.B. Mason and CEOP.  Wagar Decl. at ¶ 5; Dkt. No. 7, Mem. of Law, at ¶ 22.

In terms of the Maine Litigation, Defendants Gamache and Olas are employees previously recruited by W.B. Mason from CEOP.  Dkt. No. 1, Ex. A. Maine Compl.  Their erstwhile employer alleges that both of these Defendants, prior to their departure from CEOP, executed non-competition, non-solicitation and confidentiality agreements, which they have subsequently breached while serving in the employment of W.B. Mason.  *Id*. at ¶¶ 30-70.[4]  In reference to W.B. Mason, CEOP alleges, *inter alia*, that its direct competitor induced Gamache and Olas to breach their agreements with CEOP in order to gain access to highly confidential trade secrets and to solicit CEOP's client base.  *See generally* Maine Compl.[5]

Wagar is not a party to the Maine Litigation which is in the pre-litigation stage and where CEOP intends on seeking a preliminary injunction. Dkt. No. 7, Mem. of Law at ¶¶ 3 & 10.  Since the line-up of attorneys is a factor in our discussion, we note that the law firm of Nixon Peabody, along with Stephen Rider, Esq., represent Defendants Gamache, Olas, and W.B. Mason in the Maine Litigation.

---

[4]   There are a series of causes of action against both Gamache and Olas for breach of the confidentiality agreement (Counts One and Two), tortious interference with prospective business advantage (Count Six), and common law breach of duty and loyalty (Counts Seven and Eight).  *See generally* Maine Compl.

[5]   In the Maine litigation, there are four causes of action alleged against W.B. Mason: (1) tortious interference with a contract (Counts Three and Four); (2) unfair competition (Count Five); (3) tortious interference with a prospective business advantage (Count 6); and (4) violating Maine's Uniform Trade Secret Act (Count Nine).  *See generally* Maine Compl.  We should also mention that Defendants have numerous counterclaims against CEOP.  Dkt. No. 1, Ex. B, Defs.' Answer with Counterclaims.

## II. DISCUSSION

### A.  The Subpoena

As stated above, on September 27, 2006, Defendants served a subpoena upon Wagar for his testimony, along with a Document Demand which seeks ten categories of documents. Dkt. No. 1, Ex C., Subpoena; Dkt. No. 7, Mem. of Law at ¶ 11.  The deposition was initially scheduled for October 3, 2006, and may have been adjourned to October 24, 2006, however this Motion to Quash interceded and precluded the actual deposition.  *Id*. at ¶ 12.

Wagar raises numerous challenges to the Subpoena but he avers that he has limited knowledge of Defendants Gamache and Olas, had limited professional intercourse with either, and may have spoken to Olas on only two occasions.  *See* Dkt. No. Prelim. Statement.  He further avows that he has no knowledge of the terms of Gamache's and Olas' non-compete agreement.  *Id*. Because of the paucity of his knowledge on either, he contends that he has no relevant information to share with the Maine litigators.  *Id*.  In Wagar's view, the ten categories of documents sought by this Subpoena "pertain only to [his] recruitment by and employment with W.B. Mason and his re-employment by CEOP[,]" and thus are irrelevant.  *Id*. at pp. 5-6.  The finer legal points he raises concern Rider's and Nixon Peabody's possible conflict of interest in that should they depose him, a deposition may invade the attorney-client privilege and the work product doctrine, and lastly, that enforcement of the Subpoena would impose an undue burden upon him.  *See generally* Prelim. Statement.

As we mentioned above, and at the heart of Wagar's posture, he avers that he shared many confidences with Attorney Rubenstein and provided him with information so that Rubenstein could prepare certain legal submissions on his behalf and he strongly believes that Rubenstein and Thaxter

6

were "acting as one of [his] lawyers in the New Jersey Action." Dkt. No. 8, Lance Wagar Decl., dated Nov. 20, 2006, at ¶¶ 3 & 4.

Defendants bring to the Court's attention that on August 30, 2006, CEOP noticed Leo Meehan, W.B. Mason's CEO, for deposition, in support of the preliminary injunction. Dkt. No. 7, Mem. of Law, at ¶¶ 3 & 4. Meehan objected to the deposition and eventually a conference was convened, on September 13, 2006, by the United States Magistrate Judge to determine the relevancy of Meehan's deposition. *Id.* at ¶¶ 5 & 6; Dkt. No. 9, Ex. A, Lt., dated Sept. 12, 2006. During the conference, CEOP's counsel represented that "he had a good faith basis for taking Mr. Meehan's deposition based upon statements made by a former W.B. Mason employee that Mr. Meehan 'has participated in meetings involving a discussion of Mason's strategy in dealing with the plaintiff as a competitor that have included matters relevant to issues in this case.'" Dkt. No. 7, Mem. of Law at ¶¶ 5 & 6. Based upon these representations, Meehan's deposition was permitted. *Id.* It is Defendants' strong belief that the source of this information was Wagar, the object of the Subpoena. *Id*. at ¶¶ 7 & 8.[6]

Challenging Wagar's averments that Nixon Peabody, Rubenstein and Thaxter were his attorneys at some juncture in the New Jersey Litigation, Defendants submit several Declarations and Affidavit of their own. Attorney Rider admits that his firm represented Wagar in the New Jersey

---

[6] In further support of their belief, CEOP refers to a memorandum of law filed in the lawsuit pending in Massachusetts Superior Court.

> In fact, one of the employees whom Mason raided from CEOP, Lance Wagar, has since returned to work at CEOP. Since he returned, Wagar has provided significant information to CEOP which supports the allegation in the Verified Complaint regarding Mason's Plans for improperly solicting CEOP's current customers and employees. CEOP is confident that with these leads, from Wagar, its discovery will provide ample support for the allegations in its Verified Complaint.

Dkt. No. 7, Mem. of Law, at ¶ 8 (citation omitted).

matter from March 14, 2006 until July 28, 2006, but nothing more.  Dkt. No. 7, Rider Aff. at ¶ 5.

Moreover, Rider states that "at no time . . . did [he] disclose to anyone at Nixon Peabody [or the law

firm of Verrill Dana, LLP] any privileged or confidential information, . . ., sought to depose Mr.

Wagar in this or any other action. . . [nor] was Mr. Wagar ever represented by any attorney at Nixon

Peabody . . . [or Verrill Dana][.]"  Dkt. No. 7, Rider Decl., at ¶¶ 4-9.  Contrary to Wagar's

asseverations, Attorney Rubenstein states that he did not receive any "confidential information from

Wagar," and what was received was set forth "in the certification he submitted[;]" "[he] never told

Mr. Wagar that [he] represented him[;] [and] . . . Stephen W. Rider and the firm of McCarter &

English, LLP, have not shared or discussed with [him] confidential information they received from

Mr. Wagar." *Id.*, Rubenstein Decl., at ¶¶ 3, 4, & 8.  Concurring with Rubenstein, Attorney Thaxter

represents that her "introduction to Mr. Wagar lasted only a few minutes . . . [she] never received

any confidential information from Mr. Wagar [or Rider] . . . [and] Nixon Peabody has never

represented Mr. Wagar[.]" *Id.*, Thaxter Decl., at ¶¶ 3-7.  Lastly, Alexia Pappas, of counsel to Verrill

Dana LLP, emphatically declares that his Maine law firm has "never represented Lance Wagar . .

. spoken to [him] . . . [nor] received any confidential information concerning Mr. Wagar [from

anyone at Nixon Peabody LLP or Stephen W. Rider, Esq[.]" *Id.*, Alexia Pappas Decl., dated Nov.

10, 2006, at ¶¶ 2 & 3.

 Ostensibly then, Defendants gainsay Wagar's claim of conflict of interest or violation of the

Attorney Disciplinary Rules  and further submit that Wagar does indeed possess information and

has personal knowledge relevant to the Maine Litigation.  *See generally* Dkt. Nos. 7, Mem. of  Law

& 9, Reply Mem. of Law.

 In the context of discovery from a non-party, the vehicle for such compelled disclosure is

found in FED. R. CIV. P. 45. The party issuing a subpoena "shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena," thus Federal Rules of Civil Procedure 45(c)(1) places a burden upon the serving party to prove that it has complied with this mandate. *In re Subpoena Duces Tecum Served on Bell Comm. Research, Inc.*, 1997 WL 10919, at *2 (S.D.N.Y. Jan. 13, 1997) (citations omitted). Rule 45 also imposes a burden on the recipient to produce and/or permit inspection and copying within fourteen (14) days after service of the subpoena. FED. R. CIV. P. 45(c)(2)(B); *In re Subpoena Duces Tecum Served on Bell Comm. Research, Inc.*, 1997 WL 10919, at *2 n. 2. A party responding to a subpoena is required to produce documents as they are kept in the ordinary course of the party's business. FED. R. CIV. P. 45(d)(1). If there are objections to the subpoena, either party may seek court intervention. *See* FED. R. CIV. P. 45(c)(2)(B) (Motion to Compel) & (3)(A) (Motion to Quash). In our case, Wagar initiated this proceeding by bringing a Motion to Quash the Subpoena based upon the grounds that said subpoena requires the disclosure of privileged and protected matters, is unduly burdensome, and not relevant. FED R. CIV. P. 45(c)(3)(A) (iii) & (iv). In doing so, Wagar bears a heavy burden of proof. *Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir. 1996) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984)). We must, therefore, determine if Wagar has met his burden.

## B. Relevancy

Because a subpoena is being used as a discovery device, it is well settled that a court seeking resolution of a discovery dispute within the parameter of the subpoena should refer to the Rules set forth in FED. R. CIV. P. 26-37. One such issue presented to this Court is the relevancy of the testimony and documents being sought by Defendants.

The scope of discovery in federal lawsuits is significant and broad.  FED. R. CIV. P. 26(b)(1) states in pertinent part that:

> [p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

The 2000 Amendments to this discovery statute created a two tier analysis on how information will be disclosed.  When the discovery is party controlled, relevancy is guided by whether it relates to the claims and defenses plead.  FED. R. CIV. P. 26(b)(1) advisory committee's notes 2000 Amend. However, the court shall retain authority to grant broader and more flexible discovery.   In this regard, when the court's authority is invoked, relevancy revolves around good cause being shown and that the requested matter is relevant to the subject matter involved in the case.  *Id.*; *In Re Surety Ass'n,* 388 F.2d 412, 414 (2d Cir. 1967) ("The only restriction placed upon the matters which may be gone into upon discovery examinations is that they be relevant.").   Considering the court's inherent powers to regulate discovery and permit discovery of information relevant to the subject matter, discovery then, in a sense, is more expansive and liberal, guided by the reasonable needs of the case.  *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943 (2d Cir. 1992).  Generally speaking, the burden of establishing relevancy is on the party seeking the disclosure.  *See A.I.A. Holdings S.A. v. Lehman Bros.,* 2000 WL 763848, at *3 (S.D.N.Y. June 12, 2000).

To be relevant, the request for information must be "germane" to the subject matter of the claim, defenses or counterclaims, though not necessarily limited by such pleadings, and is not controlled by whether it will be admissible at trial.  *In re Surety Ass'n,* 388 F.2d at 414 ("[P]arties should not be permitted to roam in the shadow zones of relevancy and to explore matter which does

10

not presently appear germane on the theory that might conceivably become so."); *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 556 (S.D.N.Y. 1996).  However, the demarcation between what information is relevant to the claims and defenses and relevant to the subject matter cannot be defined with precision.  FED. R. CIV. P. 26 advisory comm. notes 2000 Amend; *see also Shang v. Hotel Waldorf-Astoria Corp.*, 77 F.R.D. 468 (S.D.N.Y. 1978) (when drawing boundaries that define what information is relevant to the subject matter involved in the action, there is no way to state a general rule by which boundaries can be drawn).  Thus, the court must weigh a host of factors to determine relevancy and reasonableness.  *See In re Surety Ass'n*, 388 F.2d at 414 (the trial judge has considerable discretion on the issue of relevancy).

Since this Court's role in determining relevancy on the subject matter was not significantly changed by the 2000 Amendment, except that the party seeking the discovery from the court must show good cause, we are permitted to seek some guidance from precedents prior to the enactment of these amendments.  A court may restrict discovery to the claim and defense, but it need not.  The court is permitted, depending on the nature of the case, to broaden the scope of discovery.  In this vein, the requirement of relevancy with regard to discoverable matters should be construed liberally and with common sense*.  In re Agent Orange Product Liability Litig.*, 98 F.R.D. 558, 559-60 (E.D.N.Y. 1983); *see also Kerr v. United States District Court,* 511 F.2d 192, 196 (9th Cir.), *aff'd* 426 U.S. 394, 397-99 (1976) (there has been explicit recognition that the question of relevancy is to be more loosely construed at the discovery stage than at trial).

Wagar proclaims that he does not possess any information relevant to the Maine Litigation, even though he was an erstwhile litigant in the New Jersey Litigation where the issues have identical earmarks to the Maine matter.  Since the New Jersey lawsuit is a virtual template of the Maine

lawsuit, Wagar further argues that the information Defendants seek has no bearing upon the issues in the Maine action.  In this regard, Wagar asserts that the subpoena for production of documents has no bearing on the non-compete agreements of Defendants Olas and Gamache, and  more importantly, he has no intimate knowledge of the terms and breadth of these Defendants' agreements with CEOP.  Hence, he should not be compelled to provide testimony nor produce documents.

Conversely, Defendants proffer that indeed Wagar is in possession of relevant information and his assertions of ignorance are disingenuous and inaccurate.  Defendants' areas of inquiry include the following:

> Defendants seeks Mr. Wagar's testimony and documents in his possession in order to discover: (1) any evidence of Mr. Meehan's involvement in the hiring of CEOP employees; (2) whether Mr. Wagar continued to work at W.B. Mason without advising W.B. Mason that he was either working for CEOP or had agreed to return to work for CEOP; (3) what Mr. Wagar did with the W.B. Mason provided laptop and the information contained therein that he refused to return to W.B. Mason; (4) what W.B. Mason information Mr. Wagar revealed to CEOP; and whether Mr. Wagar revealed W. B. Mason attorney-client confidences to CEOP.

Dkt. No. 7, Defs.' Mem. of Law, at p. 3 & 7.

Succinctly the Documents to be produced are:
> (1) the computer W.B. Mason provided with any information therein;
> (2) documents related to Wagar's decision to leave CEOP and join W.B. Mason;
> (3) all documents provided to Wagar by W.B. Mason;
> (4) all documents Wagar created during his employment with W.B. Mason;
> (5) all documents concerning Wagar's decision to leave W.B. Mason;
> (6) all documents provided to Wagar by CEOP;
> (7) all documents relating to claims by CEOP;
> (8) all documents from CEOP relating to W.B. Mason;
> (9) all documents relating to promises CEOP made to Wagar;
> (10) documents concerning conversations with W.B. Mason employees and officers.

Dkt. No. 1, Ex. C, Subpoena.

We agree with Defendants that Wagar has pertinent information and documents germane to the subject matter of the Maine Litigation.  We find that the facts within his personal knowledge are relevant and may lead to admissible evidence.  Defendants have produced a strong inference that

Wagar has been traversing both sides of the Mason/CEOP aisle, and in doing so has garnered and shared information between and about the competitors, willingly and freely.  Wagar's probable disclosure to CEOP as a basis for Meehan's deposition is just one example.  It appears that Wagar's information was a critical linchpin to Meehan being deposed.  *See supra* n. 6.   By changing corporate allegiances, Wagar has placed himself at the fulcrum of this litigation maelstrom.  Considering the brevity of Wagar's employment with W.B. Mason and returning to their business nemesis within a matter of three months intimates rather vividly that he could have played the role of a corporate double agent or counter agent, infiltrating another organization and yet maintaining loyalty to another, while sharing insights into sensitive and significant practices of either, or both.  Inferences abound that Wagar may have attended high level management meetings where confidential discourse about competitors were had or he engaged in dialogue with such employees to discern W.B. Mason's business practice such that he may be the subject matter of this litigation or at least discovery fodder for CEOP.  If Wagar took a company computer and documents, which he refuses to return or acknowledge, it is rather telling that he may indeed have relevant material in his possession of which he has provided to CEOP.  This is just another glaring illustration of his relevancy to the Maine lawsuit.

Even if we accept Wagar's contention that he does not know anything about Defendants Olas' and Gamache's non-compete agreements, he still misses the gravitas of the Maine matter, and maybe intentionally, by failing to realize that the crux of the Maine case is directed against the alleged practice of W.B. Mason raiding CEOP's employees and inducing these employees to breach their non-compete, confidentiality agreements.  *See supra* n. 5.  Although named as Defendants n the Maine case, Olas and Gamache may be collateral  parties in this ongoing litigious relationship

between CEOP and W.B. Mason.

Lastly, we find highly persuasive and concur with the assessment of United States Magistrate Judge Magaret J. Kravchuk, who is at ground zero in the Maine Litigation, that Wagar's deposition is indeed relevant:

> I did indicate to the parties that based upon our discussion today and the papers provided to me I find the deposition of Lance Wagar to be relevant for discovery purposes . . . . Since Mr. Wagar is currently an employee of Corporate Express, should defendants ultimately be unable to complete this deposition Corporate Express may find that this court will not allow it to present certain evidence regarding W.B. Mason's "corporate raiding" of Corporate Express employees, as allegedly orchestrated by W.B. Mason's CEO and other management officials. Wagar is alleged to have information regarding this subject since he was, at one time, a W.B. Mason employee.

Dkt. No.. 7, Ex. B., United States District Court Report of Telephone Conference and Order, dated Oct. 19, 2006.[7]

For these reasons we find the scope of the subpoena relevant and ineluctably discoverable. However, Wagar raises other grounds that may enjoin Defendants from conducting his deposition and receiving the requested documents.

## C.  Conflict of Interest

The primary thrust of Wagar's request to quash the Subpoena relies upon the argument that if a deposition of him is permitted it would create a conflict of interest, pursuant to New York Disciplinary Rules, between him and his "former" attorneys Rider and Nixon and Peabody, who are not supposed to reveal his confidences.  And, if there is a viable conflict of interest, the attorneys for Defendants in the Maine case should be precluded from examining him.  In some respect, when

---

[7]  The only obstacles preventing United States Magistrate Judge Kravchuk from ruling on this discovery issue is the fact that Wagar does not work or reside in her district.  Thus the Maine Court lacked jurisdiction and "authority to either quash or enforce this third-party subpoena . . . [because] any motion to quash such subpoena must be filed in the district in which it was served." Dkt. No. 7, Ex. B, at p. 1 (citing FED. R. CIV. P. 37(a)(1)).

a conflict of interest of this nature is raised, there is an accompanying motion to disqualify the firm, and maybe, in essence, that is an intended, or unintended, consequence of this Motion to Quash.[8]

Nonetheless the analysis of the legal principles to quash this Subpoena are inextricably interchangeable and applied with equal force with the principles of a motion to disqualify. Even as the parties debate the merit of these Motions, they often refer to the consequences of disqualification.

Without any disagreement, Rider was Wagar's attorney for the New Jersey Litigation but Wagar strongly holds that Nixon Peabody, specifically Rubenstein and Thaxter, were also his attorneys. In Wagar's view, if they were his attorneys and he shared confidences with them, to now permit them to depose him would cause a confrontation with the attorney-client privilege and the corresponding Disciplinary Rules. Wagar further argues that Rider and Nixon Peabody cannot escape their ethical obligation by "handing the ball over" to local counsel in the Maine action, Verrill Dana LLP, and hence, Verrill Dana LLP, should be disqualified from examining him as well. Defendants vigorously refute the proposition that Nixon Peabody and Verrill Dana LLP had or have an attorney-client relationship with Wagar and controvert the presence of any conflict of interest.

Irrefutably, federal courts have the inherent authority to preserve the integrity of the adversity process and if necessary, within its broad discretion, may consider a motion to disqualify an attorney. *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005); *Human Elec., Inc. v. Emerson Radio Corp.*, 375 F. Supp. 2d 102, 105 (N.D.N.Y. 2004). In considering such a motion, courts are required to examine the substance of the professional

---

[8] Curious enough, there appears to be a pending motion to disqualify Nixon Peabody in the Maine action. Dkt. No. 7, Ex. B, Order, at p. 2.

relationship and the procedures that were implemented to minimize a breach of fiduciary duties. *Hempstead Video v. Inc. Vill. of Valley Stream*, 409 F.3d at 135. Yet, such disqualification motions are viewed with disfavor, and thus "[a] high standard of proof is required[.]" *Human Elec., Inc. v. Emerson Radio Corp.*, 375 F. Supp. 2d at 105.

There is a general legal proposition that an attorney may not appear for and oppose a client on substantially related matters when the client's interest is adverse.[9] *Solow v. W.R. Grace & Co.*, 83 N.Y.2d 303, 306 (1994). Further, an attorney owes a duty to his client not to reveal confidences. *Kassis v. Teacher's Ins. and Annuity Ass'n*, 93 N.Y.2d 611, 615-16 (1999).[10] In assessing whether the moving party met the three-prong test for disqualification, he must prove that there (1) existed a prior attorney-client relationship, (2) the matters involved in both relationship are substantially related, and (3) the interest of the present client are materially adverse to the interest of the former client. *Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123, 132 (1996); *Solow v. W.R. Grace & Co.*, 83 N.Y.2d at 308. In performing such an assessment, courts should "avoid a mechanical application of blanket rules" and carefully appraise all of the interests involved. *Tekni-Plex, Inc., v. Meyner and Landis*, 89 N.Y.2d at 132.

The rules applicable in considering a disqualification motion based upon the attorney having a conflict of interest due to multiple representations have been evolutionary. In the initial analysis

---

[9] The related New York Disciplinary Rule 5-108 reads, in part, as follows:
[A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . [t]hereafter represent another person in the same or a substantially related matter in **which that person's interests are materially adverse to the interests of the former client**.
N.Y. COMP. CODE R. & REG. tit. 22 § 1200.27(a)(1) (emphasis added).

[10] The corresponding New York Disciplinary Rule states an attorney may not disclose or use adversely information confided by a former or current clients. N.Y. COMP. CODE R & REG. tit 22 § 1200.19(b).

there existed a *per se* rule that an irrebuttable presumption, across the board, existed when an attorney of a firm appeared for and then opposed a client on substantially related matters. But as the New York Court of Appeals explained after a thorough analysis, a *per se* rule is much too broad and one size could not and should not fit all. *Solow v. W.R. Grace*, 83 N.Y.2d at 308-14; *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d at 135 (ruling that *per se* rules do not work and are ill-equipped to respect competing interest). "[A]ny fair rule of disqualification should consider the circumstances of the prior representation." *Solow v. W.R. Grace*, 89 N.Y.2d at 313. Thus, it seems that New York and federal courts have carved out a dual-headed standard controlled by the factors presented. For example, one perspective of this standard, and considering the factor presented, observes that two types of "substantially related" matters may occur: concurrent and successive. *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d at 133. In the former instance, concurrent representation, where an attorney "simultaneously represent[s] a client and another party with interests directly adverse to that client," the irrebuttable presumption that such representation is improper remains viable. *Id.* Or, as another example, under the circumstances where the law firm involved is relatively small, "characterized by its informality," the irrebuttable presumption would indeed be applicable as well. *Solow v. W.R. Grace & Co.*, 83 N.Y.2d at 313. But in all other circumstances, particularly successive representation, the law firm, especially large firms, shall have the right to rebut the presumption and present facts, *inter alia*, that (1) the former client's confidences have been protected, or (2) the firm does not possess or has acquired of the clients confidences or secrets, or (3) there are limited links to a firm that may possess client confidences, or (4) the relationship is too remote, too attenuated to matter, or (5) that if any information was acquired that it is "unlikely to be significant or material in the litigation." *Kassis*

17

*v. Teacher's Ins. and Annuity Ass'n*, 93 N.Y.2d at 617; *Solow v. W.R. Grace*, 83 N.Y.2d at 313-14 (finding that a large firm should have the ability to rebut any presumption of disqualification); *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d at 133-36 (observing that any presumption depends on the closeness and the extent of the relationship).

Moreover, we cannot ignore that courts have raised concerns that motions to disqualify may be used as a litigation tactic to gain a strategic advantage when there is no concrete concern that abuse of the confidences has or will occur, *Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d at 132; *Solow v. W.R. Grace*, 83 N.Y.2d at 310 (citation omitted), therefore we must do our due diligence and yet not be mechanical in our approach.

Here, Nixon Peabody rebuts any inference of conflict by raising in sworn affidavits that there was no attorney-client relationship with Wagar, they did not seek nor receive any confidential information from Wagar or any one else associated with him, there is no material adverse consequence to Wagar, and they are willing to allow another firm who has had no contact with Wagar perform the deposition.  We must then determine if Wagar has met his burden to quash this Subpoena.  The first element to determine is whether an attorney-client privilege may have existed.

### D.  Attorney-Client Privilege

The attorney-client privilege is a longstanding common law privilege recognized in New York and by the federal courts under FED. R. EVID. 501.  This privilege attaches to communications (1) where legal advice of any kind is sought (2) from a professional legal advisor in his or her capacity as such, (3) the communication relating to that purpose, (4) made in confidence (5) by the client, (6) are at his or her insistence  permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Bhd. of*

18

*Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997); *Madanes v. Madanes,* 199 F.R.D. 135, 151 (S.D.N.Y. 2001); *see also* 8 Wigmore, Evidence § 2292.  This privilege further attaches to the advice rendered by the attorney.  *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).  Its essential purpose is to encourage clients to be fully forthcoming with their attorney and to protect the client's legal rights.  *Asian Vegetable Research & Dev. Ctr. v. Institute of Int'l Educ.*, 1996 WL 14448, at * 4. (S.D.N.Y. Jan. 16, 1996).  "However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976); *see In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (privilege ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle) (quoting 8 Wigmore § 2291 at 554); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214.  And there can be no dispute that a corporation's "in-house counsel" is afforded the same protection as an outside counsel with respect to this privilege (*Upjohn Co. v. United States*, 449 U.S. 383 (1981)), nor is the privilege waived just because he or she is no longer employed as such.

The focus of our review is not with Attorney Rider who had an attorney-client relationship with Wagar, but rather we must visit the circumstances surrounding Nixon Peabody and the movant. Therefore, in the context of our matter, whether an attorney can be precluded or disqualified from exploring the depth of a witness' knowledge because of a previous, albeit tangential relationship, we agree with Wagar that neither a retainer agreement nor an expressed attorney-client relationship is necessary.  *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748-49 (2d Cir. 1981) (finding that what matters is "whether there exist[s] sufficient aspects of an attorney-client relationship for the purposes of triggering inquiry into the potential conflict"); *Human Elec., Inc. v. Emerson Radio*

*Corp.*, 375 F. Supp. 2d at 106-08 (noting that what is critical is that the attorney was "likely to have had access to the information").  However, our analysis has not been made easy when both parties swear to diametrically contrary perspectives of the events.  It is difficult for this Court to appreciate the dynamics of the relationship, if any, between Wagar and Nixon  Peabody during the time Wagar was a litigant in the New Jersey case, especially when one party claims that legal confidences were shared and the other party vociferously discredits such claims.

But both parties have alluded to the probability, and the facts strongly suggest, that Wagar and the other New Jersey defendants were employing a joint defense strategy.  In raising the joint defense strategy, the attorney-client privilege may be directly implicated.  The law concerning joint defense agreements in the Second Circuit's is best summarized in *U.S. v. Schwimmer,* 892 F.2d 237 (2d Cir. 1989):

> The joint defense privilege, more properly identified as the "common interest rule," *see generally* Capra, *The Attorney-Client Privilege In Common Representations*, 20 Trial Lawyers Quarterly, Summer 1989, at 20, has been described as "an extension of the attorney client privilege," *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 n.7 (9th Cir.1987).  It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.  *See United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir.1989).  Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.  *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir. 1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120 (3d Cir.1986).  "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter," Capra, 20 Trial Lawyers Quarterly, at 21 (citation omitted), and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply, *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir.1987), *vacated in part on other grounds*, 842 F.2d 1135 (9th Cir.1988) (en banc), *aff'd in part and vacated in part on other grounds*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).  Neither is it necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney.  *Matter of Grand Jury*

> Subpoena, 406 F. Supp. 381 (S.D.N.Y. 1975); *cf. Hunydee v. United States*, 355 F.2d
> 183 (9th Cir.1965).

*Id*.at 243-44 (typefaces in original).

In order then for documents and communications shared amongst those who may participate in a joint defense scheme to be considered confidential, there must exist an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy. *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) (citation omitted); *United States v. Weissman*, 1996 WL 737042, at *10 (S.D.N.Y. Dec. 26, 1996) (survey of cases). Paramount to the common interest doctrine, there must be a commonality of interest amongst the members to the agreement and each party must reasonably understand that the communications are provided in confidence.[11] *United States v. Weissman,* 195 F.3d 96, 99 (2d Cir. 1999); *Bank Brussels Lambert v. Credit Lyonnais Suisse S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (commonality of interest is more than concurrent interest).

To the extent that the communications were made in confidence amongst the agreement's allies, they ought to be deemed confidential pursuant to the attorney-client privilege. *In re Matter of a Grand Jury Subpoena Duces Tecum dated November 16, 1974*, 406 F. Supp. 381, 392 (S.D.N.Y. 1975) ("That a joint defense may be made by somewhat unsteady bedfellows does not in [and of] itself negate the existence or viability of the joint defense."). But, and it is worth

---

[11] It is obviously prudent to have a joint defense memorialized in writing. Too often the vagaries of an oral agreement cloud and pollute the true intent of the parties, especially when the parties claiming the privilege must establish that there was in fact an agreement and that the specific communication was protected thereunder. *In re Bevill, Bresler, & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986) (court denied the privilege because party failed to show that the communication was made during the course of a joint defense agreement); *Power Mofset Tech. v. Siemens AG*, 206 F.R.D. 422, 425 (E.D. Tx. 2000) (a written agreement may not be necessary but with an oral agreement you run the risk). This is exactly the dilemma the Court has encountered.

repeating, **only** those communications made in the course of an ongoing common litigation enterprise with the intent to further the enterprise are protected.  *United States v. Schwimmer*, 892 F.2d at 243; *In the Matter of Bevill, Bresler & Schulman Asset Mgmt Corp.*, 805 F.2d 120, 126 (3d Cir. 1986).  The Court is persuaded, in light of *Schwimmer*, that if a joint defense agreement exists there is an implicit understanding that one attorney is permitted not only to confer with another attorney but with the other attorney's party.  *United States v. Schwimmer*, 892 F.2d at 244 (citing *In the Matter of Grand Jury Subpoena*, 406 F. Supp. at 391-92 (permitting attorney interviews of others without the presence of their own attorney and in the presence of other co-defendants)); *see also United States v. McPartlin*, 595 F.2d 1321, 1336-37 (7th Cir. 1979) (deeming confidential communications to an investigator for a co-defendant's attorney fell within the joint defense privilege); *United States v. Walker*, 910 F. Supp. 861, 865 (N.D.N.Y. 1995) (investigator and other agents).  It is clear that the parties conferring amongst themselves, outside the confines of the group, and not for the purpose of collecting information in order to obtain legal advice, does not preserve the privilege because in that event they are not seeking legal advice or sharing information to receive legal advice.

Besides a pooling of resources, a healthy exchange of vital information, a united front against a common litigious foe, and the marshaling of legal talent and advice, *Transmirra Prod. Corp. v. Monsanto Chem. Co.*, 26 F.R.D. 572, 579 (S.D.N.Y. 1960); Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine*, A.B.A. SEC. LITIG. 201-06, 208-17 & 218-19 (4th ed.), the essential benefit of such joint collaboration is that a member of the common legal enterprise cannot reveal the contents of the shared communications without the consent of all the parties. *In the Matter of Grand Jury Subpoena*, 406 F. Supp. at 393 ("[W]ithout it the protection

22

is reduced to an improbable alternative."). That is, the privilege continues long after a member of the agreement has departed from the legal consortium and none of the parties to the agreement may unilaterally waive the privilege.

Here, we have all of the trademarks of a joint defense strategy in the New Jersey Litigation. *See* Dkt. No. 7, Mem. of Law at p. 9 ("Wagar's counsel . . . may have pursued joint defense strategy with W.B. Mason's counsel[.]")[12] Wagar states that he had numerous conversations with Rubenstein disclosing confidential information with the expectation that their conversations were related to their mutual defense and thus protected, even though his attorney, Rider, was not present. Rubenstein acknowledges that he prepared a certification for Wagar, though he discounts the privileged nature and content of his conversations with Wagar. Wagar also intimates that he was present at a joint defense strategy meeting wherein Attorney Thaxter made a presentation. Although the logic of this suggestion may be obtuse, Attorney Thaxter did represent to a New Jersey court in her application for *pro hac vice* admission that her "admission [would] substantially facilitate the defense of W. B. Mason and the individual defendants[.]"[13] Dkt. No. 7, Ex. D, Thaxter's App., at ¶ 5. And, if there was a joint defense strategy, it is reasonable to conclude that Attorney Rider may have shared some confidential information with Nixon Peabody's counsel, even though he avers that he has not. What is prevalent in this situation, nonetheless, is the likelihood that Nixon Peabody may have had access

---

[12] Defendants are arguing the point that the pursuit of a joint defense strategy does not create an attorney client relationship, citing *United States v. Kirsh*, 54 F.3d 1062, 1072 (2d Cir. 1995). Dkt. No. 7, Mem. of Law at p. 9. Based upon the unique facts and findings in *Kirsh,* our case remains distinguishable. In *Kirsh*, the Second Circuit found that **on those facts** Mara failed to show that an actual conflict occurred. Mara had independent counsel and the pursuit of a joint defense strategy, in that case, did not mean that attorney Washburn represented Mara and another defendant. However, what *Kirsh* and the line of questions mentioned above require is a case by case determination and not a bright line rule.

[13] Without more this statement can be viewed as either specifically identifying a common interest approach by all defendants or just a generic statement.

to the information. *Human Elec., Inc. v. Emerson Radio Corp.*, 375 F. Supp. 2d at 106-08 (noting that what is critical is that the attorney was "likely to have had access to the information"). Therefore, we find that there were some vestiges of an attorney-client relationship which would create the privilege.  Making this determination, however, does not necessary preclude Nixon Peabody or Verrill Dana LLP from deposing Wagar.

In carefully assessing all of the facts and interests involved, we find that Wagar has failed to prove that the Maine Litigation defendants' interests are materially adverse to his. *Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123, 132 (1996).  Wagar may have framed the issue but he has not met all of the elements of Discipline Rule 5-108. *See supra* n. 9.  A finding of materially adverse in order to quash the subpoena or disqualify the law firm is **the** prerequisite. Wagar is neither a party to nor has an interest in the Maine action, and he is no longer a litigant to the New Jersey action.  In fact, the Maine action is not considered an adversarial proceeding as to Wagar, although Wagar may detect that Defendants may harbor some hostility towards him for his action of securing W.B. Mason's computer and documents, refusing to return them, and possibly sharing with W.B. Mason's primary competitor, CEOP, an inside view on its litigation and business strategies.  Further, his failure to meet his high standard of proof includes, *inter alia*, not identifying the specific confidential information imparted to the Nixon Peabody attorneys that concerns him. *Smothers v. County of Erie*, 707 N.Y.S.2d 577, 577-78 (N.Y. App. Div. 4th Dep't 2000).  In fact, the record does not exhibit any proof that Defendants are seeking privileged information, only the notion is floated by Wagar.  All that Wagar has dangled before the Court for its review is mere conclusion and this is insufficient to sustain his burden.

Anticipating the possibility that some confidential information may be explored at this

24

deposition, we can resort to what many law firms in similar situations have previously and sufficiently initiated - create a wall or screening.  Constructing the proverbial Chinese Wall or an attorney screen is a prevalently employed method in today's legal landscape to insulate confidential information.   In establishing such a wall this case, Rider's and Nixon Peabody's nexus to Wagar is problematic, as discussed above.  However, it is represented by the Defendants that Verrill Dana LLP has not been tainted by any proximity to Wagar's confidential information or him personally.  Verrill Dana LLP has never represented Wagar, was not involved in the New Jersey Litigation, and avers that they have not received any of Wagar's confidential information.  *See generally*, Dkt. No. 7, the Affidavit & Declarations.  To have them conduct the deposition as opposed to Nixon Peabody and Rider would be an efficacious safeguard.  *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 138 (2d Cir. 2005) ("We see no reason why, in appropriate cases and on convincing facts, isolation - whether its results from intentional construction of a Chinese Wall or from *de facto* separation that effectively protects against any sharing of confidential information - cannot adequately protect against a taint."); *Sykes v. Matter*, 316 F. Supp. 2d 630, 633 (M.D. Tenn. 2004) (ruling that it is appropriate to retain another counsel to perform a cross examination).[14]

Lastly, Wagar raises that he has spoken regularly with CEOP's attorney and shared information with him in reference to W.B. Mason.  In this context, if deposed, Wagar believes that

_____

[14] Wagar postulates that Nixon Peabody cannot delegate the responsibility of the deposition to Verrill Dana LLP, relying upon *Funds of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977).  Dkt. No. 8, Wagar Mem of Law at pp. 6-7.  We agree with Wagar that *Funds of Funds* pronounced that "a lawyer cannot delegate his fiduciary duties to another in an effort to avoid its strictures or to avoid responsibility for the manner in which they  undertaken is settled law."  *Id.* at 234.  We submit that *Funds of Funds*, in the context of our facts, may be a stale principle since the use of screening and Chinese Walls in situations like ours has been the frequent and modern approach to confronting these types of ethical quagmires for more than two decades.  Second, this Court has interceded and is creating a buffer which would dissipate the harm, before the conflict of interest occurs.

he would be revealing those attorney-client privileged discussions and possibly reveal CEOP's work product in the Maine action.  We are not certain that there is an attorney-client relationship between Wagar and CEOP's attorney, but their communication may still be cloaked.  Factual investigations by a corporate attorney or its agents, which include gathering statements from employees, clearly fall within the attorney-client rubric.  *Upjohn Co. v. United States*, 449 U.S. 383, 390-91 (1981); *U.S. v. Davis*, 131 F.R.D. 391, 398 (S.D.N.Y. 1990) (citing *Upjohn Co.* for the proposition that the attorney-client privilege encompasses factual investigations).  The Supreme Court observed that attorneys dealing with a complex legal problem such as this are

> thus faced with a "Hobson's choice".  If he interviews employees not having "the very highest authority", their communications to him will not be privileged. If, on the other hand, he interviews *only* those employees with the "very highest authority," he may find it extremely difficult, if not impossible, to determine what happened.

*Upjohn Co. v United States*, 449 U.S. at 391-392 (citations omitted).

That being so, statements made by employees, of any station or level within a corporation or a sophisticated business structure, to an attorney or the attorney's agent which were done in confidence and outside the purview of others are protected.  *Bruce v. County of Rensselaer*, 2003 WL 355460, at *2 (N.D.N.Y. Feb. 11, 2003) (citing, *C.F.T.C. v. Weintraub*, 471 U.S. 343, 348 (1985) & *Upjohn Co. v. United States*, 449 U.S. at 393-96); *United States v. Davis*, 131 F.R.D. at 398.  And, if the attorney-client privilege extends to employees' statements surely it extends to the attorneys' notes, memoranda, and files pertaining to those statements.  *Upjohn Co. v. United States,* 449 U.S. at 388-90 (questionnaires submitted to corporate employees not disclosed); *Carter v. Cornell Univ.*, 173 F.R.D. 92, 94-95 (S.D.N.Y. 1997) (interview notes not disclosed).

Weighing the above instructions, the attorney-client privilege may cloak the communications between Wagar and CEOP's attorney.  However, just because the communication may be cloaked

26

with a privilege does not necessarily mean that Wagar cannot still be deposed.  Wagar cannot use the shield of confidentiality as a sword as well and limit Defendants' access to crucial information germane to the subject matter of the Maine case.  The privilege simply protects the communication between lawyer and client from discovery and does not extend to the underlying information contained in the communication.  *Henry v. Champlain Enter., Inc.*, 212 F.R.D. 73, 83 (N.D.N.Y. 2003) (citing *In re Grand Jury Witnesses*, 979 F.2d 939, 944 (2d Cir. 1992)); *Ray Larsen Assocs., Inc. v. Nikko America, Inc.*, 1993 WL 307905, at *2 (S.D.N.Y. Aug. 11, 1993).  More precisely,

> [t]he protection of the privilege extends only to communications and not to facts.  A fact is one thing and a communication concerning that fact is an entirely different thing.  The client cannot be compelled to answer the question, "What did you say or write to the Attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc.*, 111 F.R.D. 76, 79-80 (S.D.N.Y. 1986) (quoting *Upjohn Co. v. United States*, 449 U.S. at 395-96) (quotation marks in original).

Discovery of the underlying facts of a communication depends entirely on its nature, rather than the source.  *Bank Brussell Lambert v. Credit Lyonnais (Suisse) S.A.*, 1995 WL 598971, at *11 (S.D.N.Y. Oct. 11, 1995) ("A fact is discoverable regardless of how a deponent came to possess it.").  That is, the attorney-client privilege does not protect a deponent's knowledge of the relevant facts, whether they were learned by counsel or facts learned from an attorney from independent sources.  *Tribune Co. v. Purcigoliotti*, 1997 WL 10924, at *4 (S.D.N.Y. Jan. 10, 1997); *Standard Charter v. Ayala*, 111 F.R.D. at 80 (concluding that the privilege does not protect facts which an attorney obtained from independent sources and conveyed to his client) (citations omitted).  The same principles are true with regard to the work product doctrine because work product may encompass facts as well.

*In re Grand Jury Subpoena dated October 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002).[15]

Accordingly, we find that Wagar can be deposed on the relevant knowledge that he may possess.   But there is a word of caution to the examiner.   We will not permit a broad and impermissible inquiry that is "aimed at, [or] cannot help but to uncover, legal strateg[ies] that [are] properly within an attorney's zone of privacy." *In re Grand Jury Subpoena dated March 19 & Aug. 2, 2002*, 2002 WL 31040322, at *5 (S.D.N.Y. Sept. 12, 2002).  The goal of the interrogation should not attempt to learn what CEOP's counsel is thinking or his strategies or what they have learned through investigation, but rather what relevant knowledge  Wagar possess, no matter the source. The actual communication between Wagar and CEOP's attorney are outside the scope of this permitted inquiry.

### III.  CONCLUSION

Contrary to Wagar's posture in his Motion, the information sought by this Subpoena may have a significant bearing on the issues at stake in the Maine action.   Wagar's overemphasis that he has no knowledge concerning Olas' and Gamache's non-compete agreement issues in the Maine case while barely, if ever, mentioning that CEOP has several causes of action against W.B. Mason is transparently sly and a failed attempt to distract the Court from the over arching issues to be resolved in Maine. *See supra* n. 5. The Maine action is as much about W.B. Mason's alleged tactics of corporate raiding as it may address the enforcement of Defendants Olas and Gamache's confidentiality agreements, and in this regard, Wagar has garnered keen insights relative to the matters at hand.  For example, if Wagar shared the contents of the computer and provided copies of

---

[15] Wagar has raised the work product doctrine but it is not his privilege to invoke.  The work product doctrine exists to protect the attorney's mental impression, opinions, and/or legal theories concerning the litigation. *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989).  It is the attorney, not the client, who advances the doctrine when responding to a request for production.

W. B. Mason's documents, which may have a bearing on any of the issues of the Maine action, to CEOP's management and attorney, then he has relevant knowledge which relates to claims and defenses therein. *Lugosch v. Congel*, 218 F.R.D. 41, 45 (N.D.N.Y. 2003). He has clearly entered the legal fray in the Maine case if he shared with CEOP information about W.B. Mason's CEO, Leo Meehan's presence at a strategy meeting and the substance of that meeting, or any other meeting, even if Defendants could confirm that information from others. Yet, this Court cannot fathom a better witness than Wagar who has had a bird's eye view of the internal operations, corporate strategies and thinking of these two competitors that are now playing out in our courts. Wagar is not exempt from participating in discovery just because it is an inconvenience to him, or more convenient if someone else can provide those facts.

Those areas of inquiry enumerated in Defendants' memorandum of law are fertile grounds for interrogation. Dkt. No. 7, Mem. of Law at p. 7. All of the document requests, except possibly one, are proper and relevant demands. Dkt. No. 1, Ex. C, Subpoena. The demand for "[a]ll documents from CEOP concerning or relating to W.B. Mason" may be a search into CEOP's work product. When inquiring about this information, there should be some forbearance to the work product doctrine, much like the limitation on inquiries as to the communication with CEOP lawyers and the advice Wagar may have received.

As we stated above, the best course shall be that Verrill Dana LLP conduct the deposition. Verrill Dana LLP's knowledge of Wagar's communication with Rider and Nixon Peabody shall not be tainted by any subsequent edification by those counsels, and should remain pristine. Anticipating that Wagar's deposition may disintegrate into a donnybrook as the litigators struggle and tussle over the nature of each and every inquiry, staining to parse the meaning of every question and every

29

statement, the Court will direct that the deposition take place in the James T. Foley Courthouse, 445 Broadway, Albany, New York, in the lawyers' lounge located directly across from our Chambers, so that we can intercede at a moments notice to quell the embers of any conflagration and manage this deposition with a modicum of decorum and efficiency. Wagar's deposition shall not last more than 7.5 hours.

For the reasons stated herein, it is hereby

**ORDERED**, that Lance Wagar's Motion to Quash the Subpoena (Dkt. No. 1) is **DENIED**; and it is further

**ORDERED**, that Defendants' Cross Motion Compelling Lance Wagar to Comply with the Subpoena (Dkt. No. 7) is **GRANTED IN PART AND DENIED IN PART**, consistent with this Order; and it is further

**ORDERED**, that the law firm of Verrill Dana LLP shall conduct the deposition of Lance Wagar and Lance Wagar shall produce the demanded documents consistent with this Order. Lance Wagar's deposition shall be held at the United States District Court, James T. Foley Courthouse, 445 Broadway, New York, in the Lawyer's Lounge on the Fourth Floor contiguous to this Court's Chambers. Lance Wagar's deposition shall occur within twenty days from the receipt of this Order and shall last no longer than 7.5 hours. The date and time of this deposition must be coordinated with this Court's Chambers.

**IT IS SO ORDERED**.

Date:   December 13, 2006
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge